**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**BERNADINE DENISE B.,** [1]

       **Plaintiff,**

v.                                                          **Civil Action No. 2:23-cv-114**

**MARTIN O'MALLEY,** [2]
**Commissioner of Social Security,**

       **Defendant.**

## REPORT AND RECOMMENDATION

    Plaintiff Bernadine Denise B. seeks judicial review of the Commissioner of Social Security's denial of her claim for Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). Specifically, Plaintiff argues that the Commissioner's Administrative Law Judge ("ALJ") improperly evaluated opinion evidence from Plaintiff's treating providers. As a result, she argues that the ALJ's residual functional capacity ("RFC") determination is the product of legal error and not supported by substantial evidence. Plaintiff also contends the ALJ did not conduct a proper function-by-function analysis of how her impairments affect her ability to work. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), and Rule 72(b) of the Federal Rules of Civil Procedure.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Since the filing of the case, Martin O'Malley was appointed the Commissioner of Social Security. He is therefore automatically substituted as a party pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

This Report concludes the ALJ adequately considered the medical and opinion evidence in the record, and therefore recommends that the court affirm the final decision of the Commissioner.

## I. **Procedural Background**

Plaintiff protectively filed for DIB under Title II of the Act on July 28, 2020. (R. 23, 214). She alleged disability beginning on June 28, 2019, based on type II diabetes, a rod in her left leg, depression, high blood pressure, and neuropathy. (R. 99, 235). The state agency denied her application initially and on reconsideration. (R. 4, 129, 158). Plaintiff then requested an administrative hearing. (R. 90). On June 1, 2022, the hearing was held remotely due to the COVID-19 pandemic.[3] (R. 45, 203–04). Counsel represented Plaintiff at the hearing, and an impartial vocational expert ("VE") testified. Id.

On June 27, 2022, the ALJ denied Plaintiff's claim for DIB, finding she was not disabled during the period alleged. (R. 20). The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 29). The ALJ also found that Plaintiff's RFC permitted her to perform past relevant work and other work within the national economy. (R. 36–39). On February 8, 2023, the Appeals Council denied Plaintiff's request for review. (R. 4).

On March 24, 2023, Plaintiff filed her complaint in this court. (ECF No. 1). She seeks judicial review of the Commissioner's final decision that she was not disabled, claiming "[t]he agency committed error of law by denying Appeals Council review of the decision," and "[t]he conclusions and findings of fact of the Defendant are not supported by substantial evidence and are contrary to law and regulation." (ECF No. 1, at ¶¶ 4, 8). Plaintiff argues the case should be remanded because the ALJ "failed to properly evaluate the opinion of Elizabeth Shaubell, NPC as

---

[3] Plaintiff signed the Agency COVID-19 Remote Hearing Agreement Form. (R. 203).

co-signed by Thomas Vanbrunt Jr., D.O." Pl.'s Mem. Support Social Security Appeal ("Pl." Mem.") (ECF No. 11, at 9) (emphasis removed). As a result of these errors, Plaintiff contends that the ALJ's decision to deny her claim for DIB is not supported by substantial evidence. Id. at 9–26. On October 2, 2023, the Commissioner opposed Plaintiff's brief and asked the Court to affirm her decision. Br. in Support of the Commissioner's Decision & Opp'n Pl.'s Mot. Summ. J. ("Def.'s Opp'n") (ECF No. 12). Plaintiff replied. (ECF No. 13). After a review of the record, this Report considers each of these arguments.

## II.   **Factual Background**

Plaintiff was born on September 27, 1962, and at the time of the ALJ decision was 59 years old. (R. 49). She has not engaged in substantial gainful activity since June 28, 2019, the alleged onset date. (R. 26–27). Plaintiff has a Bachelor of Science in Electronics and reported past work as a career agent team leader, community relations specialist, financial assistance coordinator, and executive director. (R. 59).

## A.   **Plaintiff's Health Treatment**

Plaintiff's arguments in this court do not require a complete review of her medical history, as she only disputes the ALJ's assessment of certain medical opinions. The treatment Plaintiff received, as relevant to the briefs before the court, is outlined below.

### 1.   **Plaintiff's Treatment at Pivot Physical Therapy**

On November 14, 2019, Plaintiff began treatment at Pivot Physical Therapy in Norfolk, Virginia. (R. 362). Plaintiff was treated by Sarah Beth Gillette, Physical Therapist (PT) and Doctor of Physical Therapy (DPT). Id. Plaintiff reported that she was in a motor vehicle accident in October 2018, and has since experienced back and left hip pain. Id. Plaintiff also shared that she was involved in a motor vehicle accident in the 1990s. Id. Plaintiff suffered severe injuries,

3

and had an intramedullary rod placed in her left thigh.  Id.  Plaintiff told PT Gillette that she "has to sleep on her l[eft] hip for relief," and has "increased clicking and popping in" her left hip when walking.  Id.  Plaintiff reported seeing a chiropractor in early 2019 which resulted in "some relief." Id.  Plaintiff explained that she is performing activities of daily living "more slowly," and is not exercising regularly because of her pain.  Id.  She indicated an interest in trying yoga.  Id.  Plaintiff "reported feeling worse over the past 2-3 months with no change in activity or recent injury."  Id. Plaintiff stated that her "diabetes impacts [her] dizziness," and her current pain level was an 8/10, on a 1-10 pain scale—with 10 being the worst pain.  Id.  She reported aggravating factors, including prolonged walking, prolonged sitting, and prolonged standing.  Id.  Plaintiff stated that she has some relief from lidocaine patches and heat.  Id.  Plaintiff reported no history of falls.  Id.

PT Gillette found Plaintiff has "symptoms consistent with [left] hip pain related to degenerative changes as well as mechanical low back pain." (R. 364).  PT Gillette noted Plaintiff "presented with pain, ROM [range of motion] loss, decreased strength, [and] decreased activity tolerance."  Id.  Plaintiff "presented with frequent weight shifts while sitting in chair." (R. 363). PT Gillette concluded that Plaintiff was "a good candidate for physical therapy based on [her] tolerance to today's treatment." (R. 364).

The following week, on November 22, 2019, Plaintiff returned to Pivot Physical Therapy and was treated by PT Gillette. (R. 359).  Plaintiff "reported feeling good overall today but very sore following [her] initial visit."  Id.  Plaintiff "expressed concern about feeling as sore following today's treatment."  Id.  Plaintiff completed her therapeutic exercises, including the stepper, reclined squats, double knees to chest with a ball, resisted walking, and lateral cone step overs. (R. 360).  PT Gillette found Plaintiff "continues to progress towards [her] stated goals," and "tolerated treatment well."  Id.  PT Gillette noted Plaintiff "is progressing well through [the] plan

4

of care but has minimal changes in pain." Id. Nonetheless, PT Gillette found Plaintiff had "steady" progress toward her goals, and would "continue to benefit from PT." Id.

On November 26, 2019, Plaintiff returned to physical therapy with PT Gillette. (R. 356). Plaintiff "reported feeling better overall." Id. PT Gillette added additional therapeutic exercises to Plaintiff's treatment plan with a focus on "balance training for neuromuscular re-education." Id. Plaintiff completed the stepper, reclined squats, double knees to chest with a ball, resisted walking, lateral cone step overs, cone taps, and balance exercises on a rebounder (mini trampoline). (R. 357). PT Gillette found Plaintiff "continues to progress" at a "steady" rate, and "tolerated treatment well." Id.

On December 2, 2019, Plaintiff had an appointment with PT Gillette. (R. 353). Plaintiff "reported feeling good overall but very tired today." Id. Plaintiff completed her therapeutic exercises, including the stepper, double knees to chest with a ball, reclined squats, resisted walking, lateral cone step overs, balance exercises on a rebounder, and cone taps. (R. 354). PT Gillette found Plaintiff "continues to progress towards [her] stated goals," and tolerated treatment well. Plaintiff "was limited" during treatment "secondary to fatigue." Id. Three days later, on December 5, 2019, Plaintiff had physical therapy with PT Gillette. (R. 350). Plaintiff told PT Gillette that she "has had no pain since" receiving acupuncture the past Tuesday. Id. PT Gillette added exercises to Plaintiff's therapy program, including sidelying clamshells and side stepping to promote hip strength and stability. Id. Plaintiff completed her new exercises and the stepper, reclined squats, double knees to chest with a ball, resisted walking, balance exercises on a rebounder, cone taps, and side stepping in/out from under a bar. Id.

On December 10, 2019, Plaintiff met with PT Gillette. Plaintiff "reported feeling good overall with the pain relief following acupuncture." (R. 347). The PT added anti-rotation presses

5

to Plaintiff's exercises, and Plaintiff "progressed to a single leg stance while completing cone taps." Id. Plaintiff also completed the stepper, reclined squats, resisted walking, side steps, and sidelying clamshells. (R. 348). Similarly, on December 12, 2019, Plaintiff "reported feeling pretty good," and PT Gillette added new exercises to Plaintiff's therapy program—singe hand pull downs and standing hip abductions at a pulley. (R. 344). Plaintiff completed these new exercises and the stepper, reclined squats, resisted walking, cone taps, side stepping in/out from under a bar, sidelying clamshells, and anti-rotation presses. (R. 345). PT Gillette noted Plaintiff "tolerated treatment well," and "continues to progress towards" her stated goals. Id.

On December 17, 2019, Plaintiff had an appointment with PT Gillette. (R. 341). Plaintiff "reported she woke up with wrist pain which is limiting her activity tolerance today." Id. The PT noted Plaintiff denied hip pain but reported hip muscle soreness. Id. Plaintiff completed exercises including the stepper, double knees to chest with a ball, resisted walking, cone taps, side steps in/out from under a bar, sidelying clamshells, standing hip abduction, and supine bridges. (R. 342). PT Gillette noted Plaintiff "continues to progress towards stated goals," and was "self limiting today secondary to wrist pain." Id. PT Gillette noted Plaintiff "continues to require education regarding [the] difference between muscle activation/soreness compared to reproduction of hip pain." Id. PT Gillette found Plaintiff would continue to benefit from physical therapy to address all of her goals. Id. Two days later, on December 19, 2019, Plaintiff saw PT Gillette and "reported feeling better since she ate breakfast today." (R. 338). Plaintiff did not report wrist pain. Id. PT Gillette added exercises to Plaintiff's program, including lateral step ups and the balance beam. Id. Plaintiff completed the new exercises and the stepper, double knees to chest with a ball, resisted walking, cone taps, side steps in/out from under a bar, sidelying clamshells, standing hip abduction, supine bridges, running man on a BOSU exercise ball, and zombie squats. (R. 339).

6

PT Gillette found Plaintiff "tolerated treatment well," and "continues to progress towards stated goals. Id. PT Gillette also noted that she"[p]rogressed [Plaintiff's] lateral hip strengthening to promote stability," and that Plaintiff would "continue to benefit from PT to address all goals." Id.

On December 27, 2019, Plaintiff told PT Gillette she was "feeling tired" and "had not eaten anything all day because she was afraid she would have to exercise harder." (R. 335). The PT told Plaintiff the importance of eating "at least once before 2:30pm for energy, health, and safety with community activities." Id. Plaintiff completed her exercise program, including the stepper, double knees to chest with ball, resisted walking, cone taps, side seps, side stepping in/out from under a bar, sidelying clamshells, standing hip abduction, supine bridges, running man on the BOSU ball, and zombie squats. (R. 336). PT Gillette found Plaintiff "continues to progress towards stated goals," and "tolerated treatment well" but "was challenged with stability training likely secondary to fatigue related to improper nutrition." Id.

On January 7, 2020, Plaintiff had physical therapy with PT Gillette. (R. 332). Plaintiff "reported feeling very fatigued but denied having low back pain, [] hips." Id. The PT educated Plaintiff "on [the] difference between muscle soreness and hip pain." Id. Plaintiff "required increased" support when completing "balance activities secondary to fatigue." Id. Plaintiff completed her therapy exercise program, including the stepper, double knees to chest with a ball, resisted walking, cone taps, side stepping in/out from under a bar, sidelying clamshells, standing hip abduction, supine bridges, running man on a BOSU exercise ball, and zombie squats. (R. 333). PT Gillette found Plaintiff "tolerated treatment well," "continues to progress towards stated goals," and "will continue to benefit from PT." Id.

On January 9, 2020, Plaintiff met with PT Gillette and "reported feeling good overall." (R. 329). PT Gillette increased Plaintiff's resistance walking in all four directions, and "[a]dded

lunges and rows with lunge stance to promote increased trunk stability and hip strength." Id.
Plaintiff reported continued "progress towards stated goals," and reported fatigue "with hip
abduction strengthening but [was] able to perform without reproduction of symptoms." (R. 330).
Plaintiff also completed the stepper, double knees to chest with a ball, resisted walking, cone taps,
side steps in/out from under bar, sidelying clamshells, standing hip abduction, supine bridges,
running man on BOSU exercise ball, and zombie squats. Id. The PT found Plaintiff "progressed
LE strengthening with good mechanics." Id.

On January 17, 2020, Plaintiff attended physical therapy with PT Gillette. (R. 325). PT
Gillette found that Plaintiff "has met [a] majority of [her] goals," but "continues to report reduced
function while also demonstrating reduced interest in performing exercise at home." Id. The PT
recommended Plaintiff continue therapy for one to two times per week for two weeks, then
transition to a home exercise program. Id. The following week, on January 23, 2020, Plaintiff
had physical therapy with PT Gillette. (R. 322). Plaintiff reported a recent fall up the stairs "after
tripping to ger her dog." Id. She reported treating her pain with medication and lidocaine patches.
Id. Plaintiff "tolerated treatment well," and "was able to participate in nearly full program with
minimal changes in symptoms." (R. 323). Plaintiff completed exercises including the stepper,
double knees to chest with a ball, resisted walking, lunges, unilateral row with static lunge, cone
taps, side steps in/out from under a bar, sidelying clamshells, supine bridges, running man on a
BOSU exercise ball, and zombie squats. Id. PT Gillette found Plaintiff would "continue to benefit
from PT." Id. Later that month, on January 30, 2020, Plaintiff again met with PT Gillette. (R.
319). At the appointment, Plaintiff reported feeling "better since starting" physical therapy, and
"her [current] pain is related to [a] recent fall up the stairs." Id. Plaintiff was treated for pain in
her knee and left hip, and she did not report wrist pain. Id. Plaintiff "tolerated treatment well,"

8

but "required increased cueing for continued strengthening following rest breaks indicating reduced motivation." (R. 320). PT Gillette noted Plaintiff would continue to benefit from physical therapy treatment. Id. This was the last physical therapy appointment with PT Gillette in Plaintiff's medical record.

### 2.    Plaintiff's Other Health Treatment

On September 17, 2019, Plaintiff went to the MHP Boone Clinic and reported "stomach pain." (R. 1070). Plaintiff stated that she has experienced this pain since her car accident in October, 2018. Id. Plaintiff rated her pain a 7/10 when lying down, and she reported a history of issues with her gallbladder. Id. Plaintiff was examined by Thomas Vanbrunt, D.O. Id. Plaintiff told Dr. Vanbrunt that she "discontinued all" of her diabetes "medications close to 6 months ago." (R. 1071). Plaintiff also shared that she "has not been checking her glucose," and admitted "to bilateral hand and lower extremity paresthesias." Id. Plaintiff's glucose level was high, and Dr. Vanbrunt referred her to the emergency department "for IV hydration and further assessment." (R. 1076).

One week later, on September 24, 2019, Plaintiff had a follow-up appointment for hyperglycemia with Dr. Vanbrunt and stated her pain was a 0/10 (no pain). (R. 1063, 1066). Dr. Vanbrunt noted Plaintiff was well-appearing, well developed, well nourished, and in no acute distress. (R. 1065). Dr. Vanbrunt noted Plaintiff "would benefit from weight loss strategies and lifestyle modification that would assist with better control of Type II" diabetes." (R. 1066).

A few months later, on December 3, 2019,[4] Plaintiff had an appointment with Dr. Vanbrunt and complained of left hip pain she has had for the past five days. (R. 1032). Plaintiff stated "she

---

[4] As mentioned, Plaintiff had a PT appointment on December 2, 2019, and "reported feeling good overall." (R. 353). During the appointment, Plaintiff completed strenuous exercises including the stepper, reclined squats, resisted walking, and exercises on a mini trampoline. (R. 354). PT Gillette observed throughout her treatment notes that Plaintiff often confuses soreness from exercise with pain. See (R. 342) ("[Plaintiff]

was on her feet a lot on Thanksgiving and her[r] left hip feels sore and is shooting pain up into her back." Id. On examination, Dr. Vanbrunt found Plaintiff's hip was not tender of palpitation, no instability, and no hip tenderness was observed with ambulation. (R. 1034). Dr. Vanbrunt provided Plaintiff with acupuncture, and Plaintiff reported an 80% reduction of pain. (R. 1035). Plaintiff "was assessed for side effects," and observed walking after treatment. Id.

On April 7, 2020, Plaintiff had a follow-up telehealth appointment with the MHP Boone Clinic, and was examined by Karen Charlton, NMN. (R. 1023). Plaintiff reported she was "[f]eeling fine," and had no swelling in her legs. Id.

Later that year, on September 21, 2020, Plaintiff had an appointment with NP-C Shaubell at the MHP Boone Clinic. (R. 990). Plaintiff reported experiencing "left side middle chain pain" the past two weekends that lasts a few seconds and then resolves. Id. Plaintiff stated she experiences the pain randomly, and "usually happens when she is just sitting there." Id. Plaintiff denied chest pain during the appointment. Id. Plaintiff also stated that her left ankle had been swollen the past four weeks. Id. Plaintiff stated her neuropathy is worse since she decreased her Gabapentin prescription, but her sleepiness is better. Id. Plaintiff noted that she feels unstable on her feet and wants her vitamin B12 checked. Id. On examination, NP-C Shaubell found Plaintiff had no abdominal pain, but had back pain, limb pain, and limb swelling. (R. 992). NP-C Shaubell noted no tenderness over the chest area. Id. Plaintiff had edema present on her left ankle. Id. Her mood was euthymic and normal. Id. NP-C Shaubell found Plaintiff's blood pressure had "not been well controlled," and before her appointment Plaintiff forgot to take her blood pressure medicine. (R. 996). NP-C Shaubell increased Plaintiff's Gabapentin prescription, and noted Plaintiff was previously advised to titrate her medication up from a reduced dosage, but she did

---

continued to require education regarding difference between muscle activation/soreness compared to reproduction of hip pain.")).

not follow this instruction.  Id.  NP-C Shaubell also discussed with Plaintiff ways to manage her symptoms, including dietary changes, compression stockings, weight loss, and lifestyle changes. Id.

On October 13, 2020, Plaintiff had an appointment with Dr. Vanbrunt and complained of right-side stomach pain.  (R. 978).  Plaintiff noted that her symptoms are worse after certain meals, including "spicy/fried/fatty foods."  (Id.; R. 883).  Plaintiff stated she "started to take her diabetes medications as prescribed since [her] prior visit and her BG [blood glucose] has improved some in the mornings."  (R. 978).  On examination, Plaintiff was well-appearing, well developed, well nourished, and in no acute distress.  (R. 980).  Dr. Vanbrunt performed acupuncture on Plaintiff, and she immediately reported a 60% reduction of pain.  Id.  After each acupuncture insertion, Plaintiff "was assessed for side effects, walked, and [her] pain level was reassessed."  Id.

The following month, on November 6, 2020, Plaintiff had a telehealth appointment with Dr. Vanbrunt.  (R. 969).  Plaintiff reported persistent left hip and lower back pain.  Id.  Plaintiff stated she was not taking her insulin as prescribed, and she has not been checking her morning blood glucose.  Id.  The treatment notes included that Plaintiff is independent and capable of managing herself.  (R. 970).  Dr. Vanbrunt "[s]uspect[ed] [her] current pain [is] exacerbated by poorly controlled diabetes."  (R. 971).  Dr. Vanbrunt increased Plaintiff's Gabapentin prescription. Id.  That same month, on November 16, 2020, Plaintiff returned to Dr. Vanbrunt for acupuncture treatment.  (R. 963).  Dr. Vanbrunt observed that Plaintiff was well-appearing, well developed, well nourished, and in no acute distress.  (R. 965).  Dr. Vanbrunt performed acupuncture in Plaintiff's back and right lower extremity for neuropathy.  Id.  After receiving the treatment, Plaintiff reported a 68% reduction of pain.  Id.  "After each insertion, [Plaintiff] was assessed for side effects, walked, and [her] pain level was reassessed."  Id.

11

The next year, on January 20, 2021, Plaintiff had a virtual appointment with Dr. Vanbrunt and complained of persistent lower extremity paresthesias and shooting pains. (R. 957–60). Dr. Vanbrunt noted "concerns with regimen compliance," and increased Plaintiff's Gabapentin prescription. (R. 960). Plaintiff was directed to follow up in one month. Id.

There is no record of a one month follow up, but five months later, on June 29, 2021, Plaintiff had a follow-up appointment with NP-C Shaubell and reported that she recently went to the emergency department after a fall in her home. (R. 1698). Plaintiff stated that she felt dizzy before her fall. Id. The emergency department told Plaintiff "she has anemia and mild hypokalemia." Id. NP-C Shaubell noted that Plaintiff recently changed her Gabapentin prescription because she was sleeping all day. Id. Plaintiff stated "she is now not sleeping as much," and her "feet feel about the same." Id. Plaintiff reported the following symptoms: "dizziness, pain in her chest/left arm[], increased urination, vomiting, headache, tired, and irritable." Id. On examination, Plaintiff was well-appearing, well developed, well nourished, and in no acute distress. (R. 1700). Her mood was euthymic and her affect was normal. Id. NP-C Shaubell "educated" Plaintiff "on the importance of managing [her] medication information." Id. NP-C Shaubell decreased Plaintiff's Lyrica dosage at night because Plaintiff agreed her symptoms started after she switched to Lyrica. (R. 1702).

On July 7, 2021, Plaintiff initiated pain management treatment with Matthew Leyton, M.D., at Comprehensive Spine and Pain Management in Virginia Beach. (R. 1530). Plaintiff primarily complained of persistent hip pain, but also mentioned hand, shoulder, and ankle pain. Id. Plaintiff reported her current pain level as a 7/10. Id. On examination, Plaintiff was alert, oriented, in no acute distress, well-developed, and well-nourished. (R. 1532). Dr. Leyton noted Plaintiff's gait/mobility was steady and antalgic. Id. Dr. Leyton observed that Plaintiff had an

12

increased angle and base of gait. Id. Plaintiff had full range of motion in her spine, and she had no tenderness in her spine area. Id. Dr. Leyton noted that Plaintiff experienced slight pain with left hip range of motion activities, and she had "notable tenderness superior and posterior to" her surgical scar. Id. Dr. Leyton found minimal tenderness in Plaintiff's trochanteric bursa region. Id. Dr. Leyton noted it was difficult to assess Plaintiff's strength "due to effort," but her sensation was normal. Id. Dr. Leyton stated that Plaintiff was "[s]itting comfortably in [a] chair." (R. 1536).

Dr. Leyton referred Plaintiff for x-rays and an MRI of her left hip. (R. 1533, 1536). The x-rays of Plaintiff's left hip showed moderate bilateral hip degenerative joint disease, heterotrophic ossification of the left hip girdle, an intermedullary rod with interlocking screws through the distal femur and greater trochanter. (R. 1536). Dr. Leyton observed "unchanged heterotopic ossification along with superior aspect of the greater trochanter." Id. Dr. Leyton also observed evidence of a healed diaphyseal femoral fracture, and moderate degenerative changes of the pubic symphysis. Id. Dr. Leyton also reviewed Plaintiff MRI, and noted "multilevel degenerative changes, most notable foraminal stenosis at L4-5 on the left and right neuroforaminal stenosis at T10-11. Id. (R. 1536, 1661–63). Dr. Leyton concluded that the MRI findings were not "really" correlative to Plaintiff's distribution of pain, and that the most significant finding was the heterotrophic ossification, which could be related to Plaintiff's reduced range of motion in her hip. (R. 1536–37).

On July 8, 2021, Plaintiff had an occupational therapy appointment at Seaside Occupational Therapy. (R. 1726). Plaintiff was evaluated by Amanda Harrison, M.S. OTR/L. (R. 1730). Plaintiff's medical history included that she has "poorly controlled diabetes" and was "complaining of recent bilateral wrist pain of unknown origin." Id. Plaintiff rated her bilateral hand and wrist pain a 5/10. Id. She also noted that her medication "at times" causes balance issues

and drowsiness. Id. On examination, Plaintiff's sitting balance was good, her mobility was good, and her functional activity tolerance was good. (R. 1728). Plaintiff's standing balance was fair, but she "demonstrated dynamic and static standing balance deficits during the evaluation." (R. 1728). M.S. Harrison found Plaintiff would benefit from skilled occupational therapy services, and recommended Plaintiff attend occupational therapy 1 time a week for 15 weeks, pending her progress and attendance. (R. 1730).

On July 14, 2021, Plaintiff had an appointment with Dr. Vanbrunt and complained of continuing dizziness and balance issues. (R. 1684). Dr. Vanbrunt found Plaintiff's balance issues may be related to her current medications, and he adjusted her prescriptions to reduce dizziness/balance concerns. Id. The next month, on August 13, 2021, Plaintiff had a follow-up appointment at the NMCP Diabetes Clinic. (R. 1672). The treatment notes included that Plaintiff has "poorly controlled" type two diabetes. Id. Plaintiff complained of numbness and tingling in her fingers and toes, but otherwise denied abdominal pain, nausea, and vomiting. Id. Plaintiff stated that she has made significant improvement in her diet and started walking. Id. On examination, Plaintiff was well-appearing, well developed, well nourished, in no acute distress, and her mobility was not limited. (R. 1674).

Later that month, on August 25, 2021, Plaintiff had a follow-up appointment with Dr. Vanbrunt. (R. 1656). Plaintiff reported left lower extremity swelling and worsening bilateral hip pain. Id. Dr. Vanbrunt observed pretibial pitting edema on examination. (R. 1658).

On September 14, 2021, Plaintiff had a follow-up telehealth appointment with Dr. Leyton. (R. 1538). Plaintiff reported continuing chronic hip pain. Id. Plaintiff stated that she was tolerating her lowered Lyrica dosage well. (R. 1538). Plaintiff admitted that she did not get her Skelaxin prescription. (R. 1540). Plaintiff denied back pain, joint pain, muscle cramps, muscle

weakness, and stiffness. (R. 1539). Dr. Leyton observed that Plaintiff was sitting comfortably in her chair during the appointment. (R. 1540).

On September 27, 2021, Plaintiff had a follow-up appointment at the Diabetic Clinic, NMCP. (R. 1612). The provider noted Plaintiff was not consistently checking her blood glucose levels. Id. On examination, Plaintiff's mobility was not limited, her balance was normal, and her gait and stance were normal (R. 1614).   Likewise, on October 22, 2021, Plaintiff had an appointment at MHP Boone, and she reported no muscle aches or limb pain. (R. 1627).   The following week, on October 20, 21, Plaintiff was treated at Vascular Flow Studies, NMCP. (R. 1647). On examination, she had no musculoskeletal symptoms and no back pain. (R. 1650). Her mobility was not limited. (R. 1651).

## B.    Opinion Evidence

### 1.    Plaintiff's Treating Providers

On September 24, 2020, NP-C Shaubell, and Dr. Vanbrunt as co-signer, completed a medical source statement for Plaintiff. (R. 910–11). The assessment was completed on a checkbox form that included questions related to Plaintiff's health and ability to work. Id. The providers listed Plaintiff's impairments as: "diabetic neuropathy causing pain and instability especially in feet [and] also … her hands." Id. They estimated Plaintiff would have to miss five or more days per month during a typical 40-hour work week schedule because of her medical conditions. Id. The monthly absence estimate corresponded to the highest level of impairment reflected on the checkbox form. Id.

NP-C Shaubell and Dr. Vanbrunt stated Plaintiff can occasionally sit, stand, and walk, infrequently stoop, and never climb. Id. "Occasionally," was defined as the individual can perform the activity from very little up to 1/3 of an 8-hour workday. Id. The providers also found

that Plaintiff, during an average workday, can occasionally lift/carry 1-5 pounds, infrequently carry 6-10 pounds, and never carry 11-20 pounds or 20+ pounds. Id. The providers noted that Plaintiff, in a full-time work environment, can occasionally use her hands for fine manipulation. Id. On page 910 of the Record, and page 1 of the checkbox assessment, the lower left-hand corner is partially cut-off, and thus a few words are illegible. See id. Nonetheless, and in light of the words that remain intact, it is clear that the cut-off questions concern Plaintiff's ability to use her hands for gross manipulation, and her ability to lift or move her arms. Id. Further, despite missing a few words, NP-C Shaubell and Dr. Vanbrunt's medical conclusions are still visible, and they found Plaintiff can infrequently use her hands for gross manipulation and can occasionally do (word omitted) with her arms. Id. Because the providers did not include an extreme limitation on the part of the form that is partially cut-off, the missing text was not essential to the ALJ's determination.

The providers further stated that Plaintiff's condition causes severe pain, and estimated that this pain would cause her to be off-task 60% of the time during an 8 -hour workday. (R. 911). NP-C Shaubell and Dr. Vanbrunt noted that Plaintiff needs to elevate her legs above her waist three times a day "due to pain, swelling, or other reasons." Id. They checked the box indicating Plaintiff has a "reasonable medical need to lie down due to pain, fatigue, or other impairment," and that she would need to lie down approximately 10-20 minutes, three times per day. Id.

NP-C Shaubell and Dr. Vanbrunt found Plaintiff would "need to take unscheduled break periods during an 8 hour work day beyond the normal 15 minute break twice per day and lunch break." Id. They also checked the box indicating that Plaintiff's limitations have lasted or are expected to last for 12 consecutive months or longer. Id. The providers noted that Plaintiff experiences side effects from her Gabapentin prescription which would interfere with her ability

16

to maintain focus and concentration. Id. Finally, NP-C Shaubell and Dr. Vanbrunt stated that Plaintiff does not "require the use of an assistive device to ambulate." Id.

### 2.  State Agency Examiners

#### a.  Brian Strain, M.D.

On December 10, 2020, as part of Plaintiff's initial DIB determination, state agency medical consultant Brian Strain, M.D., independently reviewed Plaintiff's medical records. (R. 106). Dr. Strain concluded that Plaintiff's statements regarding her symptoms were partially consistent with the total medical and non-medical evidence in the record. Id. Dr. Strain explained his finding:

> The symptom-imposed limitations appear to be partially consistent. The severity of the symptoms and the alleged effect(s) on function are not entirely consistent with the total medical and non-medical evidence, including statements by the claimant and others, observations regarding ADLs [activities of daily living], and alterations of usual behavior or habits. Some symptoms appear to be disproportionate to the severity and duration that would be expected, based on the claimant's medically determinable impairment(s). The RFC is reduced accordingly and remains with appropriate restrictions to compensate for the impairments and associated symptoms that can be medically determined.

Id. Dr. Strain found Plaintiff can occasionally lift and/or carry 20 pounds and frequently lift/and or carry 10 lbs. (R. 106–07). Dr. Strain concluded Plaintiff can stand and/or walk, and sit, (with normal breaks) for about six hours in an eight-hour workday. (R. 107). Dr. Strain found Plaintiff was unlimited in her ability to push and/or pull. Id. Dr. Strain cited to specific evidence that supported his conclusions, including that Plaintiff "improved squatting angle and sit to stand, [and] demonstrated a normal gait." Id.

Dr. Strain found Plaintiff has postural limitations, and can occasionally climb ramps/stairs, frequently climb ladders/ropes/scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. (R. 107–08). Dr. Strain again cited to evidence of Plaintiff's "improved squatting and sit

17

to stand" and her "normal gait." (R. 108). Dr. Strain stated Plaintiff has no manipulative limitations, visual limitations, communicative limitations, or environmental limitations. Id.

Dr. Strain concluded that Plaintiff can perform past relevant work, and provided the following RFC:

> [Plaintiff's] condition results in some limitations in [her] ability to perform work related activities. However, these limitations do not prevent [her] from performing work [she has] done in the past as a/an Career Agent Team Leader, as she described. We have determined that [Plaintiff's] condition is not severe enough to keep [her] from working. We considered the medical and other information and work experience in determining how [Plaintiff's] condition affects [her] ability to work."

(R 110–111).

###### b.   Robert McGuffin, Jr., M.D.

On reconsideration, state agency medical consultant Robert McGuffin Jr., M.D., independently review Plaintiff's medical record. (R. 119–20). Dr. McGuffin found Plaintiff has exertional limitations and can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and sit, stand and/or walk (with normal breaks) for about six hours in an eight-hour workday. (R. 119). Dr. McGuffin concluded that Plaintiff has no push and/or pull limitations in her upper or lower extremities. Id. Dr. McGuffin noted that Plaintiff has postural limitations, and can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. Id. Dr. McGuffin found Plaintiff can frequently climb ladders, ropes, and scaffolds. Id. Dr. McGuffin concluded that "[u]pon review of the evidence obtained at the initial level as well as newly acquired evidence, we have determined the assessment stands as proposed." (R. 120) (emphasis added).

### C.   Testimony Before the ALJ

At the hearing on June 1, 2022, the ALJ heard testimony from Plaintiff and an impartial VE, Edith Edwards. (R. 30, 45–84).

### 1.    Plaintiff's Testimony

On direct questioning by the ALJ, Plaintiff testified that she is married and lives with her husband and adult grandson in a one-story home. (R. 58). Plaintiff stated that her husband is retired and has a military disability rating. Id. She noted that her husband does not need her assistance, and he instead helps her. Id. Plaintiff stated that her twenty-three-year-old grandson has a job. Id. Plaintiff noted that she has a driver's license, and a disability determination on her license. (R. 58–59). Plaintiff testified that she has a Bachelor of Science Degree in Electronics. (R. 59).

The ALJ asked Plaintiff about her anxiety and depression. (R. 62). Plaintiff testified that she is not seeing a psychiatrist or psychologist, but she has an upcoming initial appointment with a psychiatrist. Id. Plaintiff stated she has never gone to the emergency department as a result of her mental health issues because her "pride wouldn't" let her. Id. Plaintiff testified that she experiences dizziness and falls down, and she has "scars and whatnot to prove that." Id. But, Plaintiff admitted she is not prescribed a cane or other assistance device. Id. Plaintiff explained that she does not use a cane because does not "go out much" and it may "have something to do with that pride." Id. The ALJ noted that falls can happen inside the home, and Plaintiff acknowledged that observation "is correct," but her pride stops her from using a cane. Id. Plaintiff testified that she has mentioned her falls to her doctors, and "[a]t one time" her falls were caused by the medicine she was taking—Gabapentin. (R. 63). Plaintiff then noted that the "reason why [she hasn't] been prescribed a cane is because [she has] at least two canes in [her] house at this time and even crutches." Id. Plaintiff stated she does not use the crutches, but reiterated her belief that she was not prescribed a cane because she "already ha[s] one." Id.

The ALJ then read Plaintiff excerpts from her treatment notes, which challenged her position as to why she is not prescribed a cane. (R. 64). The ALJ first read "Exhibit 8F at Page 77" which is dated October 28, 2021. Id. There, "the doctor noted normal gait" or a "normal ability to walk." Id. In response, Plaintiff stated "that doctor is the same doctor who was into alternative therapy and he would give me acupuncture in my ear." Id. The ALJ then read "Exhibit 8F at 73 … October 29th, it's the next day and once again it's normal gait and stance, normal balance." (R. 64). These treatment notes are from an appointment at the NMCP Diabetic Clinic, and not the doctor mentioned above. See (R. 1612). The ALJ asked Plaintiff if she took her cane when she went to see the doctor, and Plaintiff responded "[n]o," because her pride would not let her. (R. 64). The ALJ then asked Plaintiff why she uses a cane inside the home but not outside the home, and Plaintiff clarified that she has "a cane" but she does not "try to use it," and instead "try[s] to walk without any assistance." Id.

The ALJ reviewed Plaintiff's functional statement, and noted that "it seems very limiting" and wanted to know whether "this was just a bad day for [her] or a period of time in which the medications weren't working properly." Id. The ALJ continued and asked Plaintiff if her symptoms have remained consistent since the statement was "written on June 21st of last year," and further if her symptoms have been this way since "her alleged onset date back in September of 2019 and continuing through today." (R. 64–65). The ALJ observed that the statement includes that Plaintiff sleeps "18 to 20 hours per day," and asked Plaintiff if that is true today. (R. 65).

Plaintiff stated that she sleeps "anywhere from [] 12 to 18 hours and that's because [of] the medication. The Lyrica and the Gabapentin, both of them. The main side effect is drowsiness, so I take it and I can sleep." (R. 65). Plaintiff testified that she has mentioned this side effect to her doctor. Id. The ALJ then observed Plaintiff's statement in her function report that her clothes are

too tight and hurt her body.  Id.  Plaintiff explained that she "try[s] to wear loose clothes" because

when she wears tight clothes she feels "shock … [and] sensory signals throughout [her] body,"

and it "just doesn't feel normal."  Id.  Plaintiff noted that it is difficult for her to explain, and that

she does not have "comprehension skills" like she "used to."  Id.  The ALJ asked Plaintiff if she

has had any cognitive testing, and Plaintiff stated she has not because she did not "know" cognitive

testing is available.  Id.  Plaintiff then stated that the ALJ was a "pretty nice judge."  (R. 66).

The ALJ continued to review Plaintiff's function report, and reviewed Plaintiff's

"comment back in June of last year" that she "only took one shower a week" because the process

is "too long and too frustrating."  Id.  Plaintiff stated that it has "been like" this for about "two and

a half years."  Id.  The ALJ then read Plaintiff's statement in her function report that she can only

walk "maybe two feet," but also stated she can "walk like a minute or two."  Id.  The ALJ asked

if this statement was accurate, and Plaintiff stated she can walk [t]wo, no more than five," because

she is "tired a lot."  Id.  Plaintiff stated her hips prevent her from walking further than five feet.

(R. 66–67).  Plaintiff testified that she must take breaks while walking and "sit down, stop, or bend

over and breathe."  (R. 68).  The ALJ then asked Plaintiff the following:

> ALJ: Okay, well in most houses … a room is maybe 20 feet, maybe sometimes by
> 30 feet … And so, if you can only take a five-foot step, it could take you four
> iterations to get across the room.  Is that accurate?  And I don't want to hold you to
> that because sometimes when people start doing the math, they go oh, that doesn't
> seem right.  But if it is correct, I want to understand your testimony because the
> ability to only walk two to five feet would be noted by the doctors.
>
> Plaintiff: And the doctors say they don't notice it.  They think I can walk very well
> and … when I went to my last doctor's appointment I fell.  I fell on the way to the
> car and two people [were] kind enough to help me get up and take me to the car."

(R. 68).  Plaintiff did not return to the ALJ's question.  See id.  The ALJ then asked about

Plaintiff's issues with diabetes, and whether she is working on her diet, exercise, and medications.

(R. 70).  Plaintiff testified that she is working on her medications, "[t]rying to work" on her diet,

and she does not exercise much because she "sleep[s] more than exercise." Id. Plaintiff stated that most of her day "consists of sleeping," and she is usually asleep during the day and "up at night." Id. Plaintiff stated that she managed to stay awake for the hearing by not taking her medication. Id. The ALJ asked Plaintiff how she was feeling as a result of not taking her medication, and she stated she has "been sitting down ... standing up ... walking around back and forth in the hallway of [her] house and ... been rubbing [her] left hip." Id. Plaintiff further noted that she does not go to the grocery store, she barely leaves the house, and she does not attend family functions. (R. 71).

In response to direct questioning from her attorney, Plaintiff noted that she can "sit anywhere from five to ten minutes, 15 at the most but if [she is] sitting down, [she is] fidgeting." (R. 72). Plaintiff explained that she can "stand five, at most ten minutes. If it's close to ten minutes ... [her] hip hurts ... And [her] feet feel like lead from the neuropathy." Id. Plaintiff noted that her average hip and back pain was between a seven or eight, and is chronic. Id. She stated she has issues going upstairs and downstairs, but she is able to crouch and bend over. Id. Upon further questioning from her attorney, Plaintiff testified that it takes her "an extended time to cook." (R. 73). Plaintiff stated that her neuropathy is located in her hands and feet, and she has issues with gripping, grasping, grabbing, and lifting. Id. Plaintiff also stated that she has suicidal ideations "from time to time." Id. Plaintiff finally noted that she has side effects from her medication, including frequent urination and fatigue. (R. 74).

### 2. Testimony from the VE

The VE characterized Plaintiff's prior work as Personnel Services Manager (DOT 166.167-018), Community Public Relations Representative (DOT 165.167-014), and both of Plaintiff's most recent jobs were characterized as Social Welfare Administrator (195.117-010). (R. 75–76).

The VE testified that all of these jobs were sedentary.  Id.  The ALJ's hypothetical for the VE

posited a person with the same age, education, and work experience as Plaintiff with the following

limitations:

> she can perform up to and including a light level of activity as defined by the
> regulations but with the following max[imum] capabilities.  She could frequently
> but not always balance.  She could only occasionally climb stairs, stoop, kneel and
> crouch.  She should never climb ladders or crawl.  She'd have no more than
> occasional exposure to vibration or exposure to workplace hazards such as
> unprotected heights or dangerous machinery.  She could frequently but not always
> finger objects, that's fine manipulation with either the left or the right hand.
>
> ***
>
> I would limit her to non-production paced fast as to temp and capacity, especially
> non-assembly line type work.  Must also have reasonable access to a restroom,
> either in an office setting or something on the same floor.

(R. 76–77).  The VE testified that such a person could perform all of Plaintiff past work as

generally performed.  (R. 77).  The ALJ then asked:

> If I limited her to standing or walking … four hours total in an eight-hour workdays,
> which changes to limited light and I know that in most cases most VEs also then
> include a sit-stand option, which I discuss as must be allowed to occasionally
> alternate between sitting and standing positions while at the work station.  Now I
> note that the applicable SSR requires me to describe … the frequency of the
> alternation but [not] the duration in each position nor do I have sufficient evidence
> to reasonably limit that from the time of the alleged date all the way through the
> date of decision.  So, if I added those two additional limitations, what impact might
> that have on her ability to perform her past relevant work?

(R. 77).  The VE testified that the hypothetical perform could generally perform Plaintiff's past

relevant work, but could not work as an Executive Director.  (R. 77–78).  The ALJ then modified

the hypothetical to account for the hypothetical person's age, and added that "no more than very

little if any vocational adjustment would be allowed.  (R. 79).  The ALJ then asked the VE if:

> there are examples of any other existing semi-skilled or skilled jobs in the national
> economy which the claimant hypothetically might be able to perform in which her
> actual past work skills would be sufficient from new job examples with no more

than some vocational adjustment in terms of tools used or processes, work setting
or industry standards?

Id. The VE testified that several jobs for a person with her skills exist and provided "three jobs as

representative examples."  (R. 80).   The VE testified that the person could work as an

Administrative Assistant (DOT 169.167-010) with 189,000 jobs nationally, a Telephone Solicitor

(299.357-014) with 116,000 jobs nationally, and Customer Complaint Clerk (241.367-014) with

40,000 jobs nationally.  Id.  The ALJ asked:

> For our next couple of hypotheticals, if an individual needed to lay down even
> occasionally during the workday, what impact would that have on either the
> previous or the past relevant work or any of the jobs that you've just identified.

(R. 81).  The VE testified that this is not a normal accommodation for competitive employment,

and an employer would not tolerate more than two unexcused or unscheduled absences per month.

Id.  The VE also agreed with the ALJ "that an employer would not accept 15 percent or more time

off task in terms of productivity."  Id.  The VE noted that "exceeding these limits on even an

occasional basis [would] eliminate all competitive work in the national economy".  Id.

## IV.    **Standard of Review**

In reviewing a decision of the Commissioner denying benefits, the court is limited to

determining whether the decision was supported by substantial evidence on the record and whether

the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Mastro v.

Apfel, 270 F.3d 171, 176 (4th Cir. 2001) ; Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842

(1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126

(1938)). It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat

less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017).  Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.   Analysis

Plaintiff's brief identifies three errors in the ALJ's decision that she claims warrant remand. Specifically, Plaintiff contends that the ALJ's RFC determination was not supported by substantial evidence and is the product of legal error because he failed to properly evaluate the joint opinion of NP-C Shaubell and Dr. Vanbrunt. Pl.'s Mem. (ECF No. 11, at 1).  Plaintiff also argues that the ALJ's RFC is not supported by substantial evidence because he failed to conduct a proper function-by-function analysis concerning Plaintiff's ability to sit. Id.  Finally, Plaintiff contends that the ALJ failed to properly develop the record in connection with an illegible portion of the Shaubell/Vanbrunt opinion. Id. at 11, 19. As explained below, this Report finds no error in the ALJ's analysis and concludes that the record was properly developed.  Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

A.    **Framework for SSA Disability Evaluation.**

A person may file for and receive disability insurance benefits under the Social Security Act if he or she meets the insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d).  As relevant here, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); accord 20 C.F.R. § 404.1505(a).

An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).  SSA regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. § 404.1520(a)(4). Specifically, the regulations direct the ALJ to answer the following five questions:

1.    Is the individual involved in substantial gainful activity?

2.    Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.    Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4.    Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5.    Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled.  An affirmative answer to questions three or five establishes

disability.  The claimant bears the burden of proof during the first four steps; if the analysis reaches

step five, the burden shifts to the Commissioner to show that other work suitable to the claimant

is available in the national economy.  See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly

v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled.  20

C.F.R.  §§  404.1520(a)(3);  404.1520b.   This includes "(1) the objective medical facts; (2) the

diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective

evidence of pain and disability; and (4) the claimant's educational background, work history, and

present age."  Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th

Cir. 1967)).  Ultimate responsibility for making factual findings and weighing the evidence rests

with the ALJ.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599

F.2d 597, 599 (4th Cir. 1979)).

**B.**     **The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in substantial activity from her alleged

onset date until the hearing date.  (R. 25).  At step two, the ALJ found that Plaintiff suffered from

the following severe impairments: degenerative join disease of the bilateral hips, disorders of the

skeletal spine, and obesity.  (R. 26).  At step three, the ALJ found that Plaintiff did not suffer from

a listed impairment or combinations of impairments that met or medically equaled the severity of

one of the listed impairments.  (R. 29–31).  The ALJ then developed a finding regarding Plaintiff's

RFC.  (R. 31–36).  He determined Plaintiff was able to perform light work with the following

limitations:

> "she can frequently but not always balance.  She can only occasionally climb stairs,
> stoop, kneel, and crouch.  She can never climb ladders or crawl.  She can have no
> more than occasional exposure to vibration, or to workplace hazards such as
> unprotected heights or dangerous machinery.  She can frequently but not always

27

finger objects (i.e., fine manipulation) with either hand. She is limited to standing or walking up to four hours total in an eight-hour workday. She must be allowed to occasionally alternate between sitting and standing positions while at the workstation. She is limited to only nonproduction-paced tasks as to tempo and capacity (i.e., non-assembly line work). She must have reasonable access to a restroom (i.e., on the same floor or work in an office setting)."

(R. 31). At step four, the ALJ concluded that Plaintiff could perform past relevant work as a personal services manager and in public relations. (R. 36). At step five, the ALJ found Plaintiff could perform other work in the national economy, "considering [her] ... age, education, work experience, transferable skills, and residual functional capacity." (R. 37).

**C.     The ALJ's Evaluation of the Opinion Evidence in the Record Complies with the Controlling Regulations and is Supported by Substantial Evidence.**

Because the ALJ's evaluation of NP-C Shaubell and Dr. Vanbrunt's opinion was appropriate and consistent with SSA regulations, and the ALJ completed a proper function-by-function analysis, this Report finds no error in the ALJ's RFC determination.

**1.     The ALJ properly evaluated the medical opinion from NO-C Shaubell, as co-signed by Dr. Vanbrunt.**

Plaintiff argues that the ALJ erred by improperly evaluating NP-C Shaubell and Dr. Vanbrunt's joint medical opinion. Pl.'s Mem. (ECF No. 11, at 9–20). The Commissioner argues that the ALJ's evaluation of the opinion was proper and supported by substantial evidence. Def.'s Br.(ECF No. 12, at 16–26). Under the applicable regulations,[5] the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ may consider many factors in evaluating persuasiveness, he or she must explain only "the most important factors" of "supportability and

---

[5] On January 18, 2017, the SSA adopted new rules for considering medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c. The new rules apply to all claims filed after March 27, 2017. Id. Because Plaintiff protectively filed his claims on March 9, 2021, (R. 71, 241–44), the new rules apply.

consistency," § 404.1520c(b)(2).  Supportability evaluates whether a medical source supports his

or her opinion with "objective medical evidence and supporting explanations," § 404.1520c(c)(1),

while consistency evaluates whether "evidence from other medical sources and nonmedical

sources" also support the source's opinion, § 404.1520c(c)(2).

When evaluating a medical opinion under these rules, the ALJ cannot "cherrypick[] facts

that support a finding of nondisability while ignoring evidence that points to a disability finding."

Bilotta v. Saul, 850 F. App'x 162, 169 (4th Cir. 2021) (quoting Lewis, 858 F.3d at 869); see also

Apr. R.D. v. Saul, No. 2:20-cv-210, 2021 WL 3260072, at *9 (E.D. Va. June 29, 2021)

(recommending remand because the ALJ "selectively cherry-picked unrepresentative evidence"),

R. & R. adopted by 2021 WL 3215093 (E.D. Va. July 29, 2021).  Cherry-picking occurs when an

ALJ focuses on "a single treatment note that purportedly undermines [the source's] overall

assessment of [the plaintiff's] functional limitations . . . ."  Hudson v. Colvin, No. 12-cv-269, 2013

WL 6839672, at *8 (E.D.N.C. Dec. 23, 2013) (quoting Punzio v. Astrue, 630 F.3d 704, 710 (7th

Cir. 2011)).  But the ALJ's discussion of opinion evidence requires no specific language as long

as the requisite analysis of supportability and consistency is sufficiently apparent for judicial

review.  See Todd A. v. Kijakazi, No. 3:20cv594, 2021 WL 5348668, at *4 (E.D. Va. Nov. 16,

2021).

Here, when explaining his RFC determination, the ALJ first stated that he considered all

symptoms and the extent to which these symptoms can reasonably be accepted as consistent with

the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529

and SSR 16-3p."  (R. 32).  He then reviewed in detail the medical evidence bearing on Plaintiff's

claimed impairments.  In doing so, he noted by January 2020, Plaintiff's pain had significantly

improved with physical therapy, and she was progressing towards her goals.  (R. 33) (citing R.

320, 322)).  Although her neuropathic pain increased in September 2020 (about the time of the Shaubell/Vanbrunt opinion), by July 2021 she had a steady, though antalgic gait.  Id. (citing R. 1532).  She demonstrated balance issues, and the ALJ noted her strength was difficult to assess due to effort.  Id. (citing R. 1532).  Her sensation was normal.  Id. (citing R. 1532).  By September-October 2021, the ALJ's analysis continues, she reported pain at a 1/10, active participation in therapy for her wrist and hand, and a normal gate.  Id. (citing R. 1734)).  All of this medical evidence is cited by the ALJ in connection with his RFC assessment.

The ALJ then explicitly "considered any medical opinions and the prior administrative medical findings in accordance with the requirements of 20 CFR 404.1520c." (R. 32).  In assessing NP-C Shaubell and Dr. Vanbrunt's opinion specifically, the ALJ found the opinion was not persuasive because:

> [i]t is only supported by a brief statement regarding the claimant's impairments. It is not consistent with treatment notes and their objective findings. Only several days prior, the claimant's gait was normal. Abnormalities elsewhere were no more than mild to moderate. Instead, the opinion appears more aligned with the claimant's subjective complaints.

(R. 35).  Plaintiff insists that this reasoning is inadequate because the ALJ failed to explain how she considered the supportability and consistency factors.  Pl.'s Mem. (ECF No. 11, at 12–13). With regard to the supportability analysis, Plaintiff believes the ALJ "provided little more than a conclusory statement that the opinion was 'only supported by a brief statement regarding [Plaintiff's] impairments.'"  Id. at 12 (quoting R. 36).  Similarly, Plaintiff argues the ALJ made "boilerplate findings" when considering the consistency of the check-box opinion, and thus failed to provide a substantive discussion that enables this court's review.  Id. at 15–19.  Plaintiff contends that ALJ cherry-picked "the record to support his own findings, while ignoring all other evidence that paints a more significant picture of Plaintiff's impairments."  Id. at 17.

This argument unfairly narrows the ALJ's comprehensive review of all the medical evidence which preceded, but also informed, his rejection of the Shaubell/Vanbrunt opinion. Notwithstanding Plaintiff's arguments to the contrary, the ALJ's detailed citation to the record—which he echoes in assessing the opinion's persuasive force—addressed both the supportability and consistency of NP-C Shaubell and Dr. Vanbrunt's opinion as required by 20 C.F.R. § 404.1520c(b)(2). (R. 31–36). The ALJ found that the checkbox-style opinion was "only supported by a brief statement regarding [Plaintiff's] impairments." Def.s Opp'n (ECF No. 12) (citing R. 36). Specifically, the assessment only includes one sentence of narrative discussion, and it merely includes that Plaintiff's impairments are "diabetic neuropathy causing pain & instability esp[ecially] in feet and also pain in her hands." (R. 910).[6] NP-C Shaubell and Dr. Vanbrunt otherwise fail to explain why, for example, they believe Plaintiff can only "occasionally sit," would be off task for an estimated 60% of an eight-hour workday, or why she has a medical need to lie down ten to twenty minutes, three times per day. (R. 910–911). The supportability factor as defined in § 404.1520c(c)(1) considers whether a medical source supports his or her opinion with "objective medical evidence and supporting explanations." In the general discussion of medical evidence which formed the basis for his RFC determination, the ALJ cited NP-C Shaubell's treatment notes from September 21, 2020, where Plaintiff was well-appearing and in no acute distress. (R. 33) (citing Ex. 4F, at 78 (R. 990)). The ALJ noted that Plaintiff had "edema in the left ankle" and she complained of worsening neuropathy pain and waking up during the night. Id. (citing Ex. 4F, at 82 (994)). However, the treatment notes also include that Plaintiff's neuropathy was worse since she decreased her Gabapentin, and NP-C Shaubell subsequently increased Plaintiff's prescription. (R. 990, 996). NP-C Shaubell also stated that Plaintiff's Gabapentin was

---

[6] The ALJ specifically found that Plaintiff's diabetic neuropathy was not a severe impairment. (R. 27). Plaintiff did not challenge that finding in this court.

decreased at night, but Plaintiff was instructed at her last visit to "titrate up but never did."  (R. 996).  The records cited by the ALJ constitute substantial evidence that Plaintiff's symptoms were managed by medication when Plaintiff adhered to the prescribed regimen—as the ALJ explicitly found.  See (R. 27) (citing R. 996) ("[t]he claimant's diabetes ... was controlled with medication")); (R. 1071) ("[Plaintiff] discontinued all medications close to 6 months ago")); (R. 1700) ("[P]laintiff was educated on the importance of managing medication information")); (R. 978) (Plaintiff "started to take her diabetes medications as prescribed since [her] prior visit and her BG [blood glucose] has improved some in the mornings.")).  Based upon the above analysis, the Court finds the ALJ adequately addressed the supportability factor.

Moreover, ALJ found that the checkbox opinion was "not consistent with" NP-C Shaubell and Dr. Vanbrunt's "treatment notes and their objective findings."  (R. 36).  With regard to consistency, the ALJ explained that the checkbox opinion was not consistent with other evidence in the record, including evidence—also cited by the ALJ in his RFC finding—that Plaintiff's gait was normal just days before the medical source statement was provided. (R. 36).  Plaintiff alleges that "the ALJ's rejection for this basis is legally erroneous" because "the ALJ clearly picks and chooses from the records to support his findings, while ignoring all other evidence that paints a more significant picture of Plaintiff's impairments."  Pl.'s Mem. (ECF No. 11, at 17).  However, Plaintiff fails to acknowledge that the cited evidence is representative of the record as a whole.  For example, during Plaintiff's physical therapy treatment from November 2019 through January 30, 2020, Plaintiff completed strenuous exercises including the stepper, resisted walking, squats, and lunges.  See infra at 3-9.  Plaintiff is repeatedly noted to have a normal gait, successfully completed walking-related exercises, and derived substantial benefit from relatively rigorous therapy.  See (R. 591) ("[g]ate and [s]tance: *Normal")); (R. 619) ("no gait abnormality"); (R.

680) ("[g]ate and [s]tance: *Normal"); (R. 726) ("no gait abnormality); (R. 1781) ("[g]ait within normal limits")); see also (R. 323, 330, 333, 336, 342, 345, 351, 354, 357) (explaining that Plaintiff completed resisted walking and other rigorous walking-related exercises); and (R. 320, 323, 333, 339) (finding Plaintiff benefited from her strenuous physical therapy treatment).  Thus the ALJ did not cherry-pick facts that support his RFC finding.

The ALJ detailed the medical record in support of his RFC and highlighted additional evidence that contradicts the conclusions in NP-C Shaubell and Dr. Vanbrunt's opinion.  For example, when explaining his RFC determination, the ALJ noted that Plaintiff's "gait was steady but antalgic in July 2021 (Ex. 7F at 3)," and "she was in no acute distress," but she "had increased angle and base of gate."  (R. 33).  The ALJ observed that Plaintiff "continued to see benefit from physical therapy by September 2021," and cited to specific treatment notes where Plaintiff indicated she was doing "pretty well," and "was able to cook several days prior for a few hours without hurting afterwards."  (R. 34).  The ALJ also explained that unlike the checkbox assessment, Plaintiff's "[a]bnormalities elsewhere were no more than mild to moderate, "and the checkbox "opinion appears more aligned with the [Plaintiff's] subjective complaints."  (R. 36); see also (R. 33) ("While she made consistent subjective complaints of issues with balance, she was not noted to have problems with balance on examination.  She was even noted to have a normal gait at times.").

Reversal is not warranted simply because the record contains evidence which could support a conclusion opposite from the one reached by the ALJ.  The court must defer to the ALJ's findings if those findings are supported by substantial evidence.  Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 865.  This appeal is not an opportunity to relitigate the case.  If "conflicting evidence allows reasonable minds to differ as to whether [Plaintiff] is disabled," then the court defers to the

ALJ. Craig, 76 F.3d at 589 (quoting Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)). Because the ALJ's opinion here is supported by substantial evidence, the court does not consider whether the evidence might also support an alternative finding.

**2.      The ALJ Conducted a Proper Function-By-Function Analysis**

Plaintiff also contends that the ALJ's RFC assessment is not supported by substantial evidence because he failed to conduct a proper function-by-function analysis regarding Plaintiff's ability to sit/stand.  Specifically, Plaintiff argues that since the ALJ determined she could perform her past relevant work—and other work in the national economy—the ALJ was required to make findings in his RFC "that Plaintiff remained capable of sitting on a prolonged basis as required to perform sedentary work."  Pl.s Reply (ECF No. 13, at 5).

In support of her argument that the ALJ erred, Plaintiff relies on Dowling v. Comm'r of Soc. Sec. Admin. where the Fourth Circuit remanded because the ALJ relied on an incorrect regulatory framework and "did not indicate that his RFC assessment was rooted in a function-by-function analysis of how claimant's impairments impacted her ability to work."  986 F.3d 377, 386–89 (4th Cir. 2021).  The ALJ in Dowling only discussed Plaintiff's sitting problems "when rattling off a laundry list of her many impairments and functional restrictions," which was a "far cry from the function-by-function analysis the ALJ was required to conduct."  986 F.3d 377 at 388.  Plaintiff argues that like Dowling, the ALJ here "failed to conduct the required function-by-function analysis and only broadly mentioned the claimant's sitting problems in the decision."  Pl.'s Mem. (ECF No. 11, at 22).  Plaintiff further alleges that remand is appropriate because her ability to sit is a contested function that is "critically relevant" to determining her disability status.  Id. (quoting Esteban H. v. Comm'r of Soc. Sec., No. 2:21-CV-617, 2023 WL 2760059, at *7 (E.D. Va. Apr. 3, 2023) (internal citation omitted).  In Esteban H., "the ALJ concluded that Plaintiff can

stand up for approximately thirty minutes and sit for a few minutes when he needs to rest when performing sedentary work." 2023 WL 2760059, at *7 (internal quotation omitted). However, the ALJ never addressed if Plaintiff "was otherwise restricted in his ability to sit," and "improperly grouped" Plaintiff's sitting limitations with his other impairments. Id. The Court found that the ALJ failed to explain how "Plaintiff's ability to perform sedentary work may be affected by limitations on Plaintiff's ability to sit in an upright position." Id. Accordingly, the Court remanded the case, with the direction that the ALJ reconsider the Plaintiff's RFC and either account for his difficulties in sitting or explain why a limitation is not necessary. Id.[7]

Unlike in Dowling and Esteban H., the ALJ here was not required to specify the duration of the sit stand option because he found Plaintiff capable of a limited range of light work. In both Dowling and Esteban H., the ALJ limited the claimants to work at the sedentary exertional level. See Dowling, 986 F.3d 377 at 382; and Esteban H., 2023 WL 2760059 at *3. The Social Security Regulations provide different requirements for the ALJ depending on which exertional level of work they deem the claimant can perform. SSR 96-9p, which Plaintiff relies on to support her function-by-function argument, applies to an RFC limiting the claimant to "less than a full range of sedentary work." SSR 96-9p, 1996 WL 374185, at *1 (emphasis added). "Due to the fact that this SSR specifically references sedentary work, several cases have found the regulation does not apply where an ALJ has required a sit-stand option for light work." Gelbruch v. Colvin, No. 4:13cv54, 2014 WL 1891350, at *12 (E.D. Va. May 1, 2014) (finding that "SSR 96-p does not apply in this case where the ALJ found Plaintiff capable of a range of light work."). Because the ALJ found Plaintiff capable of a limited range of light work, SSR 96-9p does not apply, and the RFC was not required to specify the exact range of time Plaintiff could sit before having to stand.

---

[7] In Esteban, the Court directed a limited remand, and the Court did "not find than an immediate award of benefits" to be "appropriate in this case." 2023 WL 2760059, at *8.

Plaintiff argues that the regulation should nonetheless apply, because the ALJ exclusively identified sedentary past relevant work and other sedentary work in the national economy that she could perform. Pl.'s Br. (ECF No. 11, at 23) (citing R. 36)). She asserts that absent detailed findings regarding a specific length of time she could sit, the ALJ's RFC is not supported by substantial evidence. Plaintiff's argument fails for two reasons. First, by the plain language, the Act simply does not require the ALJ—after concluding that the claimant can perform a limited range of light work—to specify the exact duration the claimant is able to sit or stand before having to change positions. This fact was explicitly and correctly relied upon by the ALJ in his opinion, (R. 31, n.1, observing the applicable SSR required him to describe the frequency of alteration [between sit and stand] but not the duration in each position). More importantly, the ALJ accurately phrased his hypotheticals to the VE by specifying the frequency that his hypothetical person would need to alternate between sitting and standing—"occasionally." The VE testified regarding the availability of employment—including both past relevant work and additional jobs in the national economy—within that hypothetical. (R. 76–78). As a result, the ALJ obtained sufficient evidence to conclude that Plaintiff can perform a light level of work with standing and walking further limited to four hours in an eight-hour workday, so long as she is "allowed to occasionally alternate between sitting and standing at positions while at the workstation." (R. 31).

**D.     The ALJ Properly Developed the Record.**

Finally, Plaintiff raises a distinct argument that the ALJ failed to properly develop the record. Pl.'s Mem. (ECF No. 11, at 19–20). Dr. Vanbrunt and NP-C Shaubell's checkbox opinion was partially cut off and appears to include two additional limitations concerning Plaintiff's ability to raise her arms above shoulder level. See (R. 910). Nonetheless, and in light of the words that remain intact, it is clear that the cut-off questions concern Plaintiff's ability to use her hands for

36

gross manipulation, and her ability to lift or move her arms.  Id.  All of the checked boxes are legible.  Those checked indicate the providers believed Plaintiff could infrequently use her hands for gross manipulation, and also found she can "occasionally" do something (word omitted) with her arms.  Id.  Although the ALJ ultimately found the opinion unpersuasive, his RFC nonetheless imposed restrictions on Plaintiff's fine manipulation, and other postural limitations. (R. 31).  It is within the ALJ's discretion as to whether or not they should re-contact a treating source, and it is only necessary where the ALJ is not able to make a decision because the evidence in the case record is insufficient or inconsistent.  See 20 C.F.R. § 404.1520(b).  Here, the words cut from the checkbox form do not substantially affect the readers ability to interpret the document.  The ALJ had a complete record of Plaintiff's treatment with NP-C Shaubell and Dr. Vanbrunt.  As set forth above, there was also ample evidence to limit the persuasiveness of the opinion.  The ALJ was  not obligated to request a completely legible copy of their checkbox opinion to clarify the illegible text in light of the extensive other evidence supporting his RFC assessment.  Moreover, Plaintiff was represented by counsel, who had ample opportunity to supplement the record before the Appeals Council—but did not do so.

### V.    Conclusion and Recommendation

For the foregoing reasons, I recommend that the court DENY Plaintiff's motion (ECF No. 11) and affirm the decision of the Commissioner.

### VI.    Review Procedure

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report

is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January 5, 2023

38